FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

**APR 1 8 2006**
4:00 p.m.
Stephan Harris, Clerk
Cheyenne

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| AMPHIBIOUS ATTRACTIONS, L.L.C., a Wyoming limited liability company; and AMPHIBIOUS ATTRACTIONS OF DAYTONA BEACH, FLORIDA, L.L.C., a Wyoming limited liability company, ) ) ) ) ) ) ) | |
| Plaintiffs, ) ) | |
| vs. ) ) | Case No. 05-CV-29-B |
| TROLLEY BOATS, L.L.C., a Florida limited liability company; and DONALD R. REDMAN, ) ) ) ) | |
| Defendants. ) | |

| | |
|---|---|
| AMPHIBIOUS PARTNERS, L.L.C., a Wyoming limited liability company, ) ) ) ) | |
| Plaintiff, ) ) | |
| vs. ) ) | Case No. 05-CV-122-B |
| TROLLEY BOATS, L.L.C., a Florida limited liability company, ) ) ) ) | |
| Defendant. ) | |

**MEMORANDUM OF ORDER AND JUDGMENT**

Plaintiffs Amphibious Attractions, L.L.C., and Amphibious Attractions of Daytona Beach, Florida, L.L.C., brought suit number 05-CV-029-B against Trolley Boats, L.L.C., and Donald Redman alleging breach of contract, breach of warranty, misrepresentation, fraud, conversion, and intentional interference with contract and prospective advantage. Plaintiff Amphibious Partners, L.L.C., brought suit 05-CV-122-B against Trolley Boats, L.L.C., alleging a single count of breach of contract. Both cases involved the same set of operative facts. Thus, the cases were consolidated for trial. This Court conducted a bench trial starting on November 14, 2005, and ending on December 2, 2005. After hearing the issues presented during the bench trial, considering all evidence, and being fully advised of the premises, the Court **FINDS** and **ORDERS** as follows:

### STATEMENT OF PARTIES AND JURISDICTION

Plaintiff Amphibious Attractions, L.L.C., ("AA") is a limited liability company organized and existing under the laws of the State of Wyoming. Plaintiff Amphibious Attractions of Daytona Beach, Florida, L.L.C., ("AADB") is a limited liability company organized and existing under the laws of State of Wyoming. Plaintiff Amphibious Partners, L.L.C., ("AP") is a Wyoming limited

2

liability company.

Defendant Trolley Boats, L.L.C., ("TB") is a limited liability company organized and existing under the laws of the State of Florida. Defendant Donald Redman ("Redman") was and is resident of Florida. Redman and his wife, Gwen Redman, are part owners of TB.

Jurisdiction is proper under 28 U.S.C. § 1332. Venue is appropriate pursuant to 28 U.S.C. § 1391.

## FINDINGS OF FACT

### A.   General Findings

1.    In 1998, Redman conceived of the idea for a trolley boat, which is an amphibious vehicle used in touring operations. The trolley boat looks similar to a bus but can float and maneuver in water. The trolley boat is narrow enough to drive on streets and highways but has inflatable wings which inflate when the trolley boat is in the water. These wings increase the stability of the trolley boat.

2.    Although amphibious vehicles are not unique and have been used by the military and other touring operations for quite some time, the trolley boat design is somewhat unique. Other amphibious vehicles that have been used for touring have been too wide to drive on streets and highways. This uniqueness of the trolley boat

3

which allows it to be narrow on land and wider in the water allowed Redman to acquire a patent on his design.

3.    In 2000, Redman formed TB, a Florida limited liability company, for the purpose of manufacturing trolley boats and managing touring operations that would use the completed trolley boats.    Redman did not, however, have the necessary funding to begin manufacturing trolley boats.    Thus, he went looking for investors.    His search ultimately put him in contact with David Beagle ("Beagle"), Dr. Lou Steplock ("Steplock"), and some other potential investors from Casper, Wyoming, who were Steplock's acquaintances.

4.    In 2001, Beagle, Steplock, and the other investors decided to invest in TB.    Accordingly, Beagle and Steplock, on behalf of all of the investors, signed the "Agreement to Purchase Interest in Trolley Boats, LLC" on September 18, 2001.    According to this contract, the investors would invest $525,000 in TB to gain a 35% ownership interest.    At the time the contract was executed, it was anticipated that the investors would create a separate limited liability company to hold and manage their investment in TB.    Amphibious Partners, L.L.C., was then created and became a member of TB.    Don and Gwen Redman, collectively, were the other

4

member of TB.

5.    At the time the parties signed the equity purchase agreement, the parties also signed an Operating Agreement.  This contract established how many managers TB would have and who would serve as such managers.  According to the agreement, TB would have three managers - Redman, Beagle, and Steplock.  Redman, however, claims that only he and Beagle were managers of TB.  Nevertheless, the contract is quite clear.  In addition, there was testimony that Beagle, Steplock and the others would not invest in the company if AP was not given two manager positions in TB.  There was other evidence indicating that Steplock was a manager of TB.    For instance, there was a bank resolution signed by Redman which stated that Redman, Beagle, and Steplock were all managers of TB.

6.    At the beginning of the business relationship, Redman served as the President or General Manager of TB.  Consequently, he was in charge of the day to day operations at the manufacturing facility.  He was also the person in charge of the sales program for TB.

7.    In addition to creating AP, Beagle, Steplock, and the others also started a company called Amphibious Attractions, L.L.C. ("AA") to  purchase trolley boats from TB.  Pursuant to a document

5

entitled "Operational Agreement" and dated September 14, 2001, AA was given a favorable pricing plan for the boats. The price of the trolley boats was not to exceed $240,000. In addition to receiving special pricing, AA did not have to pay licensing or royalty fees. AA was also given the exclusive right to operate trolley boats in twenty cities. In return for these rights, TB was made a 25% owner in AA.

8. AA and the Davises, who were former partners of Redman, also created a limited liability company called Amphibious Attractions of Daytona Beach, Florida, L.L.C. ("AADB"). This company was created to manage a touring operation in Daytona Beach.

9. The $525,000 invested in TB by AP was partially used to pay off previous TB investors. Specifically, $40,000 was used to pay Margaret Scott and $322,000 was used to pay James McCotter. This left $163,000 to be used for continuing TB operations. These funds did not last long and TB soon needed more capital contributions. Consequently, AP contributed another $225,000 to TB in 2001 and 2002. In exchange, AP acquired another 15% ownership interest in the company, which made them 50% owners of TB by the end of 2002.

10. AP also loaned $75,000 to TB in five separate loans in

6

March, April, and May of 2002.   These loans contained options which, if exercised, would allow AP to convert the loaned funds into TB equity.   If exercised, the five options would allow AP to gain another 5% ownership in TB, raising its total interest to 55%. The contracts also provided that Don and Gwen Redman could buy back any converted ownership interest within twelve months of the option being exercised by AP.

11.   On April 12, 2004, AP notified Redman that it was exercising one of its options to convert a loan into equity. According to the notification, AP would acquire an additional ½% interest in TB.   On July 1, 2004, AP notified Redman that it wished to exercise its remaining options for an additional 4.5% ownership interest.   Thus, Redman was required to repurchase the company interest by at least July 1, 2005.   According to the evidence presented at trial, Redman failed to exercise his option by such date.   Consequently, AP now owns 55% of TB.

12.   Over the course of their business relationship with Redman, Steplock and Beagle became concerned about Redman's management abilities.   Sometime in January of 2004, Steplock and Beagle sent a letter to Redman detailing their concerns.   Steplock and Beagle also had a telephone conversation with Redman in January

7

of 2004. During this phone call, Redman resigned as a TB manager and as General Manager. This left Steplock and Beagle as the only acting managers of TB. They, as acting managers, hired Thom Moss as the new General Manager or President of TB.

13. On April 9, 2004, Don and Gwen Redman went to the TB manufacturing facility, accompanied by two officers from the Holly Hills Police Department, and took possession of the facility to the exclusion of AP, Beagle, and Steplock. During this takeover, the Redmans fired several employees, including Thom Moss and Linda Collins. The Redmans also took control of the AADB kiosk in Daytona Beach and the trolley boat being operated by AADB at that time.

14. On December 12, 2004, Redman received a telephone call from Steplock stating that he wanted Redman to meet him at the Daytona Beach airport to discuss settlement. Redman agreed to the meeting. At the meeting, Steplock informed Redman that TB's computers and files were on the way to Wyoming and Trolley Boat #5 was being transported to New York. Steplock admitted that he was responsible for the removal of the TB property from the Holly Hills manufacturing facility. Redman immediately went to TB's property and found that the property described by Steplock had been removed.

8

**B.    Findings Regarding Trolley Boat #1**

15.    AA purchased Trolley Boat #1 for \$240,000 pursuant to the "Operational Agreement" dated September 14, 2001.    The "Agreement for Sale of Interest in Trolley Boats, LLC" dated September 18, 2001, also refers to the sale of Trolley Boat #1.

16.    At the time of purchase, Redman represented to AA that Trolley Boat #1 would be completed in three months.    The boat was not completed in three months.    In fact, the boat was not put into service until January, 2003.

17.    Redman also told AA that Trolley Boat #1 had full United States Coast Guard ("U.S.C.G.") approval, which would allow the boat to operate anywhere in the United States.    Based upon this representation, AA took steps to set up touring operations in Miami, Florida.    The U.S.C.G. had not, however, granted approval to the boat and ultimately denied approval for the Miami operation.

18.    After TB and AA were denied approval in Miami, AADB began the process of opening operations in Daytona Beach.    AADB started operations, using Trolley Boat #1, on January 27, 2003, and continued them until November 13, 2003.    During this time, Trolley Boat #1 experienced numerous mechanical problems.    These problems were remedied to the extent possible by TB at the Holly Hills

9

facility.

19.   Most of the mechanical difficulties were caused by the trolley boat axles, which were not strong enough to hold the weight of the trolley boat.   Eventually, the axle problems became so frequent that the boat had to be taken out of service on November 13, 2003.

20.   After the boat was taken out of service, the parties agreed that the axles on the boat had to be replaced.   The parties did not agree, however, on the best method for replacing the axles. Redman suggested that Trolley Boat #1 be retrofitted.   Thom Moss thought that the best strategy was to give the boat a new hull. However, according to the written "Revised Operational Agreement," TB and AA would split the cost to rehull the boat provided that AA's share would not exceed $50,000.

21.   Since April 9, 2004, when Redman took over the Holly Hills facility, Trolley Boat #1 has been disassembled and stored at the facility.   Some parts of the boat, specifically, the seat and roof, have been destroyed by the elements.

22.   On July 23, 2004, AA advised Redman that it wished to retrieve Trolley Boat #1 from the facility and apply any proceeds that it paid toward its repair to the purchase price of Trolley

10

Boat #5. At that time, AA had paid $115,000 to TB for the rebuild of Trolley Boat #1. Redman refused to let AA pick up the boat.

## C.   Findings Regarding Trolley Boat #2

23. Pursuant to the "Agreement to Purchase" dated September 9, 2002, AA agreed to buy four trolley boats from TB at a cost of $240,000 each. This contract encompassed the purchase of Trolley Boat #2, which was to be delivered by TB on or before December 5, 2002.

24. AA paid for the boat in full by April of 2003. The Bill of Sale for Trolley Boat #2 is dated April 15, 2003.

25. Due to the inability to obtain U.S.C.G. approval for a Miami operation, TB and AA amended the "Agreement to Purchase." The "Amendment to the Agreement to Purchase" provided that "[TB] and AA agree that delivery of Vessel #2 will not be considered complete until such time as Vessel #2 receives full U.S. Coast Guard approval from the National Maritime Center, Marine Safety Center, and the Vessel Compliance Branch all in Washington, D.C." This approval was not obtained until November 13, 2003.

26. On November 20, 2003, AA and TB executed a "Revised Operational Agreement." This contract provided, *inter alia*, that "[t]he changes requested on Vessel #2 must be completed before

11

vessel is accepted for final delivery." The agreement also stated that only one trolley boat had been delivered at the time the contract was executed. Thus, as of November 20, 2003, all parties seemed to agree that Trolley Boat #2 had not been delivered.

27. In June of 2003, Redman agreed to sell a trolley boat to Kevin and Mary Ann Sherman ("Shermans") of Destin, Florida. The Shermans were the owners and operators of a tour operation named Trolley Boats of Destin ("Destin"). The purchase price of the boat was $305,000. The boat was to be delivered by July 15, 2003.

28. The boat that was originally to be delivered to the Shermans was identified by TB as Trolley Boat #3. However, Redman soon realized that Trolley Boat #3 was not going to be ready by the scheduled delivery date. Thus, Redman suggested that AA lease Trolley Boat #2 to TB, who would loan the vessel to the Shermans, until Trolley Boat #3 was completed and tested.

29. AA agreed to lease the boat to TB for a two or three week period. The lease rate was $100 per day and was to be paid by TB. The Shermans took Trolley Boat #2 and began using it in their operation. However, Trolley Boat #3 took much longer than three weeks to complete. In addition, Trolley Boat #2 had many mechanical problems and did not operate properly on a day to day

12

basis. Consequently, the Shermans sued TB for breach of contract. As part of the proceedings, the Shermans filed a lien against Trolley Boat #2 and have retained it in their possession to this day. They also refused delivery of Trolley Boat #3.

30. According to the Revised Operational Agreement, AA forgave all lease debt owed by TB to it in connection with the Sherman lease.

## D. Findings Regarding Trolley Boat #3

31. On November 20, 2003, AA and TB revised their "Agreement to Purchase." All parties recognized that $240,000 was an unrealistic price for the trolley boats. Thus, in the "Revised Agreement to Purchase," AA agreed to buy vessels #3, #4, and #5 for $320,000 each rather than the $240,000 originally agreed upon in the "Agreement to Purchase."

32. According to the "Revised Agreement to Purchase," TB was required to deliver vessel #3 by November 30, 2003. However, there was a thirty day grace period allowed for the delivery of the boat. TB met this contractual requirement and delivered the boat to AA sometime in early December of 2003. AA paid for the boat in full according to the contractual terms.

33. Trolley Boat #3, however, was not complete when delivered

13

to AA.   The boat was missing an operational wheel retraction system, a component required for permanent U.S.C.G. approval.   AA did not know about this problem at the time of delivery.   Redman, and thus TB, were privy to this information before they delivered the boat to AA.   In fact, Redman instructed an employee, Randy Teal, to make the boat look like it had a functional retraction system when in fact it did not.

34.   AA eventually discovered the retraction system deficiency of boat #3.   However, the discovery took place after the Redmans had taken over the Holly Hills facility.   Thus, due to the broken relationship with the Redmans, AA was not able to have the boat fixed at the TB facility with TB funds.   AA paid $6,450 to have the retraction system installed and finished.

35.   In addition to the retraction system installation and repair, AA also had other warranty work done on Trolley Boat #3 after the Redmans took over the facility.   This warranty work cost AA $5,557.

36.   On April 9, 2004, when Redman took over the Holly Hills facility, he confiscated AADB property.   This property included Trolley Boat #3 and the kiosk where the touring tickets were sold. Approximately $7,989 worth of the property has not been returned.

14

**E.   Findings Regarding Trolley Boat #4**

37.   According to the "Revised Agreement to Purchase," TB was required to deliver Trolley Boat #4 by January 31, 2004.  However, as with vessel #3, there was a thirty day grace period included in the contract.   If the boat was not delivered by the end of the grace period, a penalty of $100 per day would accrue against the seller, TB.   The boat was not delivered until March 29, 2004.

38.   AA had planned to use Trolley Boat #4 in a New York operation.   However, AA was not able to get sistership approval from the U.S.C.G. without vessel drawings.   Redman possessed these drawings and would not give them to AA.   Thus, AA was forced to get new drawings of the vessel at a cost of $25,419.46.

39.   AA also paid for warranty work done to Trolley Boat #4 after the Redmans took possession of the Holly Hills facility.   The total amount paid by AA was $3,760.50.

**F.   Findings Regarding Trolley Boat #5**

40.   AA agreed to purchase Trolley Boat #5 pursuant to the "Revised Agreement to Purchase."   The cost of the boat was $320,000.   As with the other vessels, AA was required to make installment payments as certain parts of the boat were completed. Once such payments were made, title to the components installed

15

passed to AA.

41.    The contract also provided an estimated delivery date. TB was required to deliver the boat by March 15, 2004. However, as with boats #3 and #4, there was a thirty day grace period. If the boat was not delivered by the end of the grace period, TB would incur a $100 per day late delivery charge.

42.    On April 9, 2004, Redman took over the Holly Hills facility. At that time, the hull for boat #5 was complete and AA had paid $32,000 towards the purchase of vessel #5. AA had also, as mentioned above, paid $115,000 toward the rebuild of Trolley Boat #1 and wished to apply those funds to the purchase of Trolley Boat #5.

43.    On July 23, 2004, AA advised Redman that it still wished to complete the purchase of Trolley Boat #5. AA noted in a July 23, 2004, letter that it wished to apply the $115,000 paid towards Trolley Boat #1 to the purchase of Trolley Boat #5.

44.    On August 13, 2004, AA advised Redman by letter once more that it wished to complete the purchase of Trolley Boat #5. In the same letter, AA also noted that Redman had failed to respond to the requests of AA to purchase boat #5.

45.    On December 12, 2004, Steplock broke into the Holly Hills

16

facility and took possession of Trolley Boat #5. He directed that the boat be taken to an undisclosed location. The boat was then held at such location until the time of trial of this matter.

46. At the time that Steplock took the boat, it was materially complete. However, since its removal from Holly Hills several parts have been removed from the boat for one reason or another.

47. AA is now holding Trolley Boat #5 in the State of Wyoming. The boat needs several repairs before it can be used for a touring operation.

## G. Findings Regarding Conversion Claim

48. When Redman took over the manufacturing facility on April 9, 2004, he took possession of the AADB kiosk. During this time, Redman used $3,750 of AADB funds to pay TB expenses.

49. Redman also wrote a check from the AADB account to himself for $900. Of this amount, $860 was placed in a TB account. The remaining $40 dollars is unaccounted for and was apparently spent by Redman.

50. At the time that Redman wrote these checks, he was the general manager of AADB. As a result, he had check-writing authority for AADB.

17

## F.    Findings Regarding AP Loan

51.  On February 24, 2004, AP agreed to loan $100,000 to TB. The terms of the loan indicated that TB would pay back the $100,000 with twelve monthly installments of $8,333.33.  TB would also pay 8% interest on the loan.  This would amount to a monthly interest payment of $666.67.  These monthly payments were scheduled to begin on May 1, 2004.

52.  These monies were originally to be used to pay down a TB line of credit at Hilltop National Bank in Casper, Wyoming. However, Steplock, acting as a manager of TB, did not use the loan to pay down the line of credit.  Instead, Steplock used the AP loan proceeds to pay other outstanding bills.

53.  TB has not made any of the monthly payments required by the loan agreement.  The entire loan balance is still outstanding.

## CONCLUSIONS OF LAW

## A.    General Conclusions

During trial several issues were presented to this Court for decision.   These issues do not necessarily concern any of the trolley boats, the loan, or the conversion claim.  The issues do, however, need to be resolved in order for the other claims to be properly settled.  The following are the Court's findings on those

18

issues.

On the issue of the proper managers of TB, the Court finds that Steplock and Beagle are the only acting managers of TB because Don Redman resigned as a manager and the Redmans have yet to assign a new manager to represent their interest. There is nothing precluding the Redmans from reassigning Don Redman to be their representative manager.

Concerning the issue of whether AP is a defaulting member of TB, the Court finds that it is not. The reasons for default put forth by Redman are insufficient. Furthermore, Redman did not give the 10 day notice required by the "Operating Agreement."

Finally, regarding the validity of the "Operational Agreement" and the "Revised Operational Agreement," the Court finds that they are not void or voidable. No party has presented a valid argument to sustain such a finding.

**B.   Conclusions Regarding Trolley Boat #1**

According to Florida law, a seller of products has a duty to deliver products which "conform to the quality or quantity specified in the express contract, if any, or in the absence of such specification, . . . to deliver a product reasonably suited for the purposes for which the product was intended . . . ."

19

Lochrane Engineering, Inc. v. Willingham Realgrowth Inv. Fund,
Ltd., 552 So. 2d 228, 232 (Fla. Dist. Ct. App. 1989). However,
once a buyer accepts a good, it is assumed that the product is
conforming or that the buyer is taking the product despite its
nonconformity. See Fla. Stat. Ann. § 672.606 (West 2004); B.P.
Development and Management Corp. v. P. Lafer Enterprises, Inc., 538
So. 2d 1379, 1381 (Fla. Dist. Ct. App. 1989). Thus, after he
accepts a good, a buyer cannot reject the product. See Fla. Stat.
Ann. § 672.607 (West 2004); B.P. Development and Management Corp.,
538 So. 2d at 1381.

A buyer may, however, revoke his acceptance if he meets the
requirements of Florida Statute § 672.608, which provides as
follows:

(1) The buyer may revoke her or his acceptance of a lot
or commercial unit whose nonconformity substantially
impairs its value to her or him if she or he has accepted
it:

(a) On the reasonable assumption that its
nonconformity would be cured and it has not been
seasonably cured; or

(b) Without discovery of such nonconformity if her
or his acceptance was reasonably induced either by
the difficulty of discovery before acceptance or by
the seller's assurances.

(2) Revocation of acceptance must occur within a
reasonable time after the buyer discovers or should have

20

discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if she or he had rejected them.

Fla. Stat. Ann. § 672.608 (West 2004); see also Frank Griffin Volkswagen, Inc. v. Smith, 610 So. 2d 597, 599 (Fla. Dist. Ct. App. 1992). However, as the statute makes clear, a buyer must prove that a good is nonconforming before he can revoke his acceptance of such good. See Gulfwind South, Inc. v. Jones, 775 So. 2d 311, 312 (Fla. Dist. Ct. App. 2000).

AA asserts that it meets the requirements of § 672.608. It contends, first of all, that Trolley Boat #1 is a nonconforming good because it had numerous and repetitive axle problems which caused the boat to become non-operational. Plaintiff also claims that it was unaware of these problems when it first accepted the boat and that once it discovered such problems, it assumed they would be seasonably cured. Finally, Plaintiff contends that it revoked its acceptance within a reasonable time.

After reviewing the evidence submitted at trial, the Court agrees with Plaintiff. Trolley Boat #1 is a nonconforming good and AA is entitled to revoke its acceptance of the vessel. The fact

21

that the boat was the first vehicle off the assembly line, or a so-called prototype, does not mean that the manufacturer is entitled to sell a dysfunctional product. AA paid a handsome amount for Trolley Boat #1 in expectation that it would be usable in touring operations. It did not expect to own several piles of parts that happen to be resting in the Holly Hills facility.

Plaintiff AA has also claimed that TB has breached the warranty of merchantability for Trolley Boat #1 due to all of the axle problems. Under Florida law, all sales of goods contain an implied warranty of merchantability if the seller is a merchant with respect to the goods sold. Fla. Stat. Ann. § 672.314(1) (West 2004). Of course, this warranty may be expressly excluded or modified by the parties. Id.; see also id. § 672.316. Goods are merchantable if they meet the requirements of Florida Statute § 672.314(2), which provides:

(2) Goods to be merchantable must be at least such as:

(a) Pass without objection in the trade under the contract description; and (b) In the case of fungible goods, are of fair average quality within the description; and (c) Are fit for the ordinary purposes for which such goods are used; and (d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and (e) Are adequately contained, packaged, and labeled as the agreement may require; and (f) Conform to the promises or affirmations of fact made on the

22

container or label if any.

Fla. Stat. Ann. § 672.314(2) (West 2004). However, when a buyer examines goods before purchasing them, there is no implied warranty of merchantability "with regard to defects which an examination ought in the circumstances to have revealed to him or her . . . ." Fla. Stat. Ann. § 672.316(3)(b) (West 2004).

Based upon the evidence provided at trial and in accordance with the Court's previous ruling, it is quite clear that vessel #1 was not merchantable. Thus, the only question is whether AA should have recognized the axle problem prior to buying the boat. The Court finds that this question must be answered in the negative. There was evidence presented that indicated that AA should have known about the axle problems. There was evidence that indicated that Beagle knew the axles could be better. However, he never testified that he thought the axles would not work at all. He simply felt that the axles should be improved on the next boat. Consequently, the Court finds that TB did breach the implied warranty of merchantability when it sold Trolley Boat #1 to AA.

AA also maintains that TB breached the implied warranty of fitness for a particular purpose. AA argues that it bought Trolley Boat #1 from TB because it thought that Trolley Boat #1 could be

23

used in Miami for touring operations. However, after AA purchased the boat it found out that it could not use the boat in Miami. AA wishes to recover the startup costs it expended in Miami.

An implied warranty of fitness for a particular purpose arises "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods . . . ." Fla. Stat. Ann. § 672.315 (West 2004).[1] However, "an implied warranty of fitness does not extend beyond the obligation to supply an article reasonably fit for the purpose intended, and does not impose a duty to furnish the best article of its kind or an article equal to any other similar or competing article." Borrell-Bigby Elec. Co., Inc. v. United Nations, Inc., 385 So. 2d 713, 715 (Fla. Dist. Ct. App. 1980) (citations omitted).

The question regarding this issue is whether AA relied upon the representations of Redman and TB when buying Trolley Boat #1. The trial evidence indicates that AA did rely on such representations. Both Beagle and Steplock testified that Redman

---

[1]    Like the implied warranty of merchantability, the implied warranty of fitness for a particular purpose may be expressly excluded or modified by the parties. See Fla. Stat. Ann. § 672.315 (West 2004).

24

told them that vessel #1 was already approved by the U.S.C.G. for operation in Miami. As it turned out, that was not true. However, in reliance on such statements, AA spent \$20,809.62 in start-up costs in Miami in preparation for a touring operation that it was never able to operate. Therefore, AA is entitled to recover such start-up costs. See Fla. Stat. Ann. § 672.715. TB is also liable for the costs that AA spent trying to pick up the vessel. Those damages total \$150.

Defendants argue that AA is not entitled to any of the relief granted by the Court for Trolley Boat #1 because of the language of the "Revised Operational Agreement." Defendants claim that AA has waived all of its rights to damages concerning Trolley Boat #1 in this document. The Court disagrees for the reasons stated immediately below.

The Court has previously ruled that the "Revised Operational Agreement" is an ambiguous contract regarding the release of claims pertaining to Trolley Boat #1. Thus, the Court must look to parol evidence to determine the parties' intent at the time of drafting. See Mac-Gray Services, Inc. v. Savannah Associates of Sarasota, L.L.C., 915 So. 2d 657, 659 (Fla. Dist. Ct. App. 2005); Jenkins v. Eckerd Corp., 913 So. 2d 43, 53 (Fla. Dist. Ct. App. 2005). Such

25

parol evidence indicates that the parties did not intend for AA to relinquish any rights or claims they may have had regarding Trolley Boat #1. Both Steplock and Beagle testified that AA was hoping to get the problems with Trolley Boat #1 remedied. AA did not, however, intend to relinquish any claims it may have had against TB for the unsatisfactory performance of Trolley Boat #1. The "Revised Operational Agreement" was an attempt to avoid litigation over Trolley Boat #1. It was not a waiver of AA's legal rights regarding the nonconformity of Trolley Boat #1.

Therefore, based upon the foregoing, the Court finds in favor of AA on claims regarding Trolley Boat #1. This includes a refund of the $240,000 purchase price and damages of $20,959.62 for the attempted pick up and Miami start up costs.

## C.  Conclusions Regarding Trolley Boat #2

AA maintains that TB never delivered Trolley Boat #2, which is currently being held by Destin, in accordance with the "Amendment to Agreement to Purchase." According to AA, since there was no delivery, it has the right to reject Trolley Boat #2 and recover the purchase price from TB.

Although this argument has some superficial technical merit, it fails because AA could not have signed the lease of Trolley Boat

26

#2 to Destin if they had not already taken delivery or possession of the boat.   One cannot lease that which he does not own and, therefore, possess.   AA wants to place the problems of their bad business judgment on TB and Redman.   The Court is unwilling to do this.   AA should be starting an action against Destin if they want their boat back.   Destin is holding a boat that belongs to AA even though Destin's suit is against TB and Redman.

AA also wants to recover the $100 per day lease payment from TB that was promised as part of the lease between AA, TB, and Destin.   AA's contention is based upon the lease language that clearly states that TB would be responsible for the lease payments of Trolley Boat #2 until Trolley Boat #3 was delivered.   TB and Redman, on the other hand, contend that AA has waived and relinquished its right to collect any rents that were due from TB. The Court agrees with the Defendants.

The "Revised Operational Agreement" clearly states that AA forgave all lease charges thus far incurred by TB.   Consequently, all parties agree that TB is not responsible for lease charges prior to November 20, 2003.   Thus, the only rent that TB could be responsible for is rent accruing thereafter.   The rental agreement does not, however, seem to allow for rent to accumulate during this

27

time.   The lease contract states that "Trolley Boat LLC agrees to pay the daily lease sum until the delivery of TRB #3 is completed." If Destin had not refused delivery, delivery and completion of Trolley Boat #3 would have taken place on November 20, 2003, the date the boat was completed and received U.S.C.G. temporary approval.  Thus, TB's responsibility for rent payments should have ended on that day, the same day the "Revised Operational Agreement" was signed.   TB should not be held responsible for Destin's decision to keep the boat.  Such an action was beyond the control of TB.   When TB signed the lease and agreed to pay the $100 lease amount, it only agreed to pay that amount until Trolley Boat #3 was completed.   It did not expect to be liable for the lease from August 26, 2003, until the end of the litigation between Destin and TB, which could extend well into the next few years.  This issue, like the possession of Trolley Boat #2 by Destin, is an issue that AA should address with Destin.

As a result, the Court finds in favor of TB and Redman on all claims regarding Trolley Boat #2.  AA is entitled to no damages from TB or Redman for Trolley Boat #2.

**D.   Conclusions Regarding Trolley Boat #3**

Plaintiff AA contends that it is entitled to recover the money

28

it spent to equip Trolley Boat #3 with a working retraction system. AA also requests that it be allowed to recoup the money it spent on warranty repairs after Redman took over the Holly Hills facility. The Court can see no reason to deny such relief. Therefore, AA may recover $6,450 from TB for the retraction completion work and $5,557 from TB for the warranty work.

AA may also recover $7,989 from Redman personally for his wrongful taking of AADB property. Redman had no claim to the AADB property on April 9, 2004, and his continued possession of such property constitutes a conversion of chattels.

AA also seeks damages from Redman for intentional interference with contract. According to Florida law, a plaintiff must prove the following elements to succeed on an intentional interference with contract claim: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional and unjustified interference with the contract; and (4) damage to the plaintiff as a result of the breach of the contract. See St. Johns River Water Management Dist. v. Fernberg Geological Services, Inc., 784 So. 2d 500, 504 (Fla. Dist. Ct. App. 2001).

In this case, the Court need look no further than the element of damages as Plaintiffs have failed to adequately prove damages on

29

this claim. For example, regarding the warranty and retraction work, AA has no claim for damages against Redman because the Court has already found TB to be responsible for the amount due. These are damages that TB would have been required to pay regardless of Redman's actions.

Furthermore, AADB has not proven its lost profits to the degree required by law. Florida law requires that a plaintiff seeking lost profits prove such damages to a reasonable certainty. Louie's Oyster, Inc. v. Villagio Di Las Olas, Inc, 902 So. 2d 901, (Fla. Dist. Ct. App. 2005). Plaintiff AADB has not done so in this case. AADB only provided the Court with average daily balances of the company till during the Redman takeover and during the days prior to that event. In addition, it did not provide the Court with the expenses incurred by the company during this time. Thus, it would be difficult for the Court to establish the net profit of the company during the Redman takeover.

Therefore, based upon the foregoing, AA is entitled to recover $12,007 from TB for the retraction and warranty work. AADB is entitled to recover $7,989 from Redman for the property currently possessed by him. Neither company, however, is entitled to recover from Redman on their intentional interference with contract claim.

30

**E. Conclusions Regarding Trolley Boat #4**

Plaintiff AA brings three separate claims for Trolley Boat #4. First, AA alleges that TB committed a breach of contract by delivering vessel #4 late and forcing AA to do its own warranty work. Second, AA claims that TB and Redman interfered with the purchase contract by refusing to provide the vessel drawings so that AA could get New York approval. Third, AA argues that TB and Redman interfered with prospective advantage when they failed to deliver boat #4, as well as boats #2 and #5, on time so that AA could start its New York operation.

Regarding the breach of contract claim, AA is entitled to recover from TB the amount it spent on Trolley Boat #4 warranty work after the Redman takeover. Such work was guaranteed in the purchase contract and would have been provided by TB were it not for the actions of Redman. TB is also liable for late delivery fees on Trolley Boat #4 in the amount of $2,700. These late fees cover the period between the end of the thirty day grace period on March 2, 2004, and the actual delivery date on March 29, 2004.

As for the tortious interference with contract claim, AA must prove: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional and

31

unjustified interference with the contract; and (4) damage to the plaintiff as a result of the breach of the contract. See St. Johns River Water Management Dist., 784 So. 2d at 504. AA seeks damages from both TB and Redman for refusing to provide vessel drawings for boat #4.

TB is not liable for interference with contract for two reasons. First, the only contract that can be established by Plaintiffs is the purchase contract between AA and TB. TB cannot be liable for tortious interference with a contract to which it is a party -- among the defendants in this case, only Redman, who is a third-party to the purchase contract, can be liable for tortious interference with contract. See Shands Teaching Hospital and Clinics, Inc. v. Beech Street Corp., 899 So. 2d 1222, 1228-29 (Fla. Dist. Ct. App. 2005). Second, damages against TB are prevented by the economic loss doctrine, which applies "where the parties are in contractual privity and one party seeks to recover damages in tort for matters arising from the contract." Indemnity Ins. Co. of North America v. American Aviation, Inc., 891 So. 2d 532, 536-37 (Fla. 2004).

The economic loss doctrine does not, however, protect Redman because he was not a party to the contract between AA and TB.

32

Thus, if AA proved the elements of intentional interference against Redman, he would be liable.   After reviewing the evidence, the Court finds that AA made such proof.   AA demonstrated that Redman intentionally withheld the vessel drawings that AA needed to get U.S.C.G. approval.   This approval was part of the bargain between TB and AA and the failure to get the drawings created a breach. Thus, Redman contributed to the breach of the contract and is liable for the cost of the drawings.

Regarding the intentional interference with prospective advantage claim, AA is required to prove "a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered."   ISS Cleaning Services Group, Inc. v. Cosby, 745 So. 2d 460, 462 (Fla. Dist. Ct. App. 1999).   However, it is legally insufficient that the plaintiff lost business with the public at large.   See Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812, (Fla. 1994) ("[N]o cause of action exists for tortious interference with a business's relationship to the community at large.").   Here, there is no proof of any identifiable agreement that the Defendants prevented from taking place. Therefore, AA is not entitled to lost profit damages for its New

York operations.

Based upon the foregoing, judgment is entered against TB and in favor of AA on the breach of contract claim in the amount of $6,460.50. Judgment is also entered against Redman and in favor of AA in the amount of $25,429.46 for intentional interference with contract. Finally, the Court finds in favor of Defendants on the intentional interference with prospective advantage claim.

## F.   Conclusions Regarding Trolley Boat #5

Regarding Trolley Boat #5, AA requests the Court to declare: (1) that it is entitled to complete the purchase of Trolley Boat #5; (2) that AA has paid $147,000 towards the purchase of boat #5, and (3) that AA is entitled to $27,200 in late fees for the delinquent delivery of Trolley Boat #5.

First, the Court finds that AA is entitled to specific performance and may complete the purchase of Trolley Boat #5. According to Florida law, a buyer is entitled to specific performance when a seller fails to deliver in accordance with the contractual terms. See Fla. Stat. Ann. § 672.711. The Florida statutes also note that specific performance is appropriate where the "goods are unique or in other proper circumstances." Id. § 672.716(1). In this case, TB failed to deliver vessel #5 in

34

accordance with the contractual terms after the Redman takeover. And, the trolley boats are unique. Specific performance is therefore proper in this case, and AA may complete the purchase of Trolley Boat #5.

Second, the Court finds that AA will be credited $147,000 towards the purchase of Trolley Boat #5. As Defendants point out, AA has only actually paid $32,000 for vessel #5. However, AA has also applied $115,000 to the rehull of boat #1, an activity which has not taken place. Thus, the Court will apply such funds to AA's purchase of Trolley Boat #5 for a total of $147,000. This means that AA owes TB an additional $173,000 for the purchase of Trolley Boat #5.

Third, the Court finds that AA is not entitled to the late fees requested. Even though the late fees requested by AA are set forth in the contract, they seem to violate the Court's sense of fairness considering all of the facts presented in this case. For example, AA has not paid for the boat in full. In addition, AA used self-help to gain possession of the boat before it had made payment in full. Thus, the Court declines to award late fee charges to AA for Trolley Boat #5.

**G.     Conclusions Regarding Conversion Claim**

35

According to the Amended Complaint and the allegations
forwarded during trial, AADB contends that Redman misappropriated
and converted $4,650 of AADB funds to his own use after the April
9, 2004, takeover. AADB contends that Redman was not authorized to
write such checks. AADB requests the return of such funds.

According to Florida law, conversion occurs when a person
wrongfully asserts a right of dominion over chattel which is
inconsistent with the right of the owner and deprives the owner of
the right of possession. Thomas v. Hertz, 890 So. 2d 448, 448
(Fla. Dist. Ct. App. 2004); Ming v. Interamerican Car Rental, Inc.,
913 So. 2d 650, 654 (Fla. Dist. Ct. App. 2005).[2] "The tort may be

---

[2]   Under Wyoming law, conversion "occurs when a person treats
another's property as his own, denying the true owner the benefits
and rights of ownership." Johnson v. Reiger, 93 P.3d 992, 999
(Wyo. 2004). In order to prove conversion, a Wyoming plaintiff
must show that:

> (1) he had legal title to the converted property; (2) he
> either had possession of the property or the right to possess
> it at the time of the conversion; (3) the defendant exercised
> dominion over the property in a manner which denied the
> plaintiff his rights to use and enjoy the property; (4) in
> those cases where the defendants lawfully, or at least without
> fault, obtained possession of the property, the plaintiff made
> some demand for the property's return which the defendant
> refused; and (5) the plaintiff has suffered damage by the loss
> of the property.

Id. at 999-1000. An analysis under Wyoming law would yield the
same result as the analysis completed by the Court according to
Florida law.

36

established despite evidence that the defendant took or retained property based upon the mistaken belief that he had a right to possession, since malice is not an essential element of the action." Seymour v. Adams, 638 So. 2d 1044, 1047 (Fla. Dist. Ct. App. 1994).

In this case, it is clear that Redman deprived AADB of the $4,650 he removed from the company checking account. The only question is whether he wrongfully asserted a right over such funds in doing so. After reviewing the evidence presented at trial, the Court finds that Redman did wrongfully assert dominion over such funds.

At one point in time, Redman was the general manager of AADB. This position gave him check writing authority and allowed him to pay the bills of AADB. However, at the time of the takeover he was no longer the general manager of AADB. Thus, he had given up his right to draft checks from the AADB account. Consequently, any funds withdrawn from that account by him were wrongfully appropriated. It does not matter if Redman thought that AADB owed money to TB. Redman did not have the authority to withdraw such funds.

Therefore, based upon the foregoing, the Court finds in favor

37

of AADB and against Redman on the conversion claim.   Redman is liable to AADB in an amount totaling \$4,650.

## H.   Conclusions Regarding AP Loan

AP argues that it made a loan to TB on February 24, 2004, and that it is entitled to recover the principal and interest due to it on such loan.  TB and Redman contend that such loan was never made because the funds dispersed by AP were not used for the purpose stated in the written loan agreement.  The Defendants also contend that the loan is invalid under Florida law because Steplock and Beagle are managers of both AP and TB.

Regarding Defendants' first argument, the Court finds against Defendants.  Defendants' claim on this issue is nothing more than an argument in semantics.  There is no practical difference between paying outstanding bills with the loaned funds and paying the line of credit.   If Steplock had paid the line of credit as the Defendants claim he should have, TB would have had to use the line of credit to pay the outstanding bills.  This would have resulted, of course, in the line of credit being extended to its limit once more -- the same place it ended up by paying the outstanding bills directly.

Regarding Defendants' second claim, Florida law states that no

38

contract between a limited liability company and one or more of its members, managers, or managing members or any other limited liability company, corporation, firm, association, or entity in which one or more of its members or managers are members or managers shall be void or voidable so long as uninterested members or managers approve the transaction. See Fla. Stat. Ann. § 672.4226. In this case, Redman, the only uninterested member of TB, approved the AP loan. His signature appears directly upon the February 24, 2004, loan agreement. Thus, the loan cannot be voided based upon the Florida conflict of interest law.

In accordance with the foregoing, the Court finds for AP on its claim for repayment of loan principal and interest. Judgment is entered against TB in the amount of $112,311.11. This amount represents $100,000 in principal and interest from May 1, 2004 until November 14, 2005, the first day of trial.

## I. Conclusions Regarding TB Cross-Claim Against Redman

TB alleges that Redman is directly responsible for any damages that are levied by the Court against TB. In support of this claim, TB argues that Redman acted grossly negligent and recklessly indifferent to the rights of the company as a whole in a great deal of his actions with TB. See Fla. Stat. Ann. § 608.4225.

39

While the Court would agree that Redman's actions were less than stellar, the Court does not believe that he is responsible for all of the damages levied against TB by this Court. For instance, TB would have been responsible for the warranty work and its costs regardless of Redman's takeover. His takeover just moved the location of the completion of the warranty work. Of course, there may have been an increased cost for the warranty work at these other locations, but this difference in cost was never placed before the Court. Thus, the Court could not levy this difference upon Redman.

Furthermore, Redman is not the only manager of TB that acted differently than a perfect manager should. Steplock broke into the facility and took possession of many TB items, including Trolley Boat #5. Ideally, Steplock would have let the judicial system settle this dispute rather than muddying the waters with his actions.

The Court also realizes that Redman was a poor business manager. He made many promises which he could not keep. He often proclaimed a delivery date which could not be met. And this frequently created problems for TB. However, such actions were not grossly negligent, willful, or fraudulent. Redman was trying to

40

make his business succeed. He was not trying to defraud TB, AA, or any other party. However, as it turns out, the business did not succeed and all parties involved want to blame Redman. The Court finds some degree of unfairness in this effort by the other parties.

Therefore, the Court finds that Redman is only personally liable for those damages specified above. TB is liable for all other damages.

### CONCLUSION

Based upon the foregoing, and for the reasons previously stated therein,

**IT IS HEREBY ORDERED** that Trolley Boats, L.L.C., is liable to Amphibious Attractions, L.L.C., in the amount of $106,427.12. This number represents the amount owed to Amphibious Attractions by Trolley Boats, $279,427.12, less the $173,000 that Amphibious Attractions owes Trolley Boats on Trolley Boat #5.

**IT IS FURTHER ORDERED** that judgment is entered against Donald Redman and in favor of Amphibious Attractions of Daytona Beach, Florida, L.L.C., in the amount of $12,639.

**IT IS FURTHER ORDERED** that judgment is entered against Donald Redman and in favor of Amphibious Attractions in the amount of

41

$25,429.46.

**IT IS FURTHER ORDERED** that judgment is entered against Trolley Boats and in favor of Amphibious Partners, L.L.C., in the amount of $112,311.11.

**IT IS SO ORDERED.**

Dated this ____/8^th____ day of April, 2006.

_____
UNITED STATES DISTRICT JUDGE